Theresa M. **BENNETT**, Plaintiff,

v.

**AMERICAN INTERNATIONAL LIFE ASSURANCE COMPANY OF NEW YORK**, Defendant.

No. 95–CV–1730.

United States District Court, N.D. New York.

Feb. 18, 1997.

Chernin & Gold (John Rittinger, of counsel), Binghamton, NY, for Plaintiff.

Bond, Schoeneck & King (Jonathan B. Fellows, Louis Orbach, of counsel), Syracuse, NY, for Defendant.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

## I. BACKGROUND

This case concerns a dispute over benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Specifically, the dispute involves the construction of the term "accident" in an accidental death insurance policy and arises from the death by asphyxiation of Plaintiff's husband. Defendant insurance company declined to pay the policy's benefits after concluding that the death was not accidental.

Timothy J. Bennett was found dead in his hotel room in Gaithersburg, Maryland, on November 16, 1994. The cause of death was determined to be autoerotic asphyxiation. At the time of his death, Mr. Bennett was 32 years old and had been married to Plaintiff for seven years. The Bennett's have three children.

Since 1993, Mr. Bennett had been employed as a Systems Engineer at Loral Corporation. On November 14, 1994, Mr. Bennett, accompanied by a coworker, left the Binghamton area and traveled to Gaithersburg, Maryland on a business trip in connection with their employment at Loral. Mr. Bennett and his coworker, Rosewell Butter-

worth, checked into separate rooms at a Marriott Courtyard Hotel in Gaithersburg.

Mr. Bennett and Mr. Butterworth had dinner together on the evening of November 15, 1994. During this meal, Butterworth observed that Mr. Bennett appeared to be his normal self and did not give any indication of being under stress or depression. (Butterworth Aff. ¶ 5). Butterworth also recalled that Mr. Bennett purchased gifts for his family while on the trip and was looking forward to delivering those gifts when he returned home. (Butterworth Aff. ¶ 5). Also on November 15, 1994, Mr. Bennett made plans to visit an old friend who lived in the area, Ralph Albano, on the evening of November 16, 1994. (Albano Aff. ¶ 4).

The following morning, on November 16, 1994, Butterworth noticed that Mr. Bennett was not in attendance at the Loral Business Center where classes were being conducted. (Pltf.Exh. B). After calling Mr. Bennett's hotel room and receiving no answer, Butterworth went back to the hotel to check on Mr. Bennett; upon returning to the hotel, Butterworth noticed that Mr. Bennett's vehicle was still in the parking lot. (Pltf.Exh. B).

With the assistance of the hotel manager, Butterworth and another coworker knocked on Mr. Bennett's door but received no answer. (Pltf.Exh. B). Because the door was dead bolted from within, a drill was used to disable the dead bolt. (Pltf.Exh. B). Mr. Bennett was found dead in his hotel room bathroom. He was clad in blue and brown pantyhose; his legs were bound together at the ankles with a brown belt, and a blue cloth approximately 5 feet in length with a slip knot was tied to the belt. (Pltf.Exh. C). Mr. Bennett's hands were positioned behind his body and were tied at the wrists by a black belt; a separate blue cloth approximately 4 feet in length was attached to the black belt between his wrists. (Pltf.Exh. C). A brown stocking covered his head, a plastic bag covered the stocking, and a green tie was loosely looped around his head with a slip knot. (Pltf.Exh. C).

The police concluded that Mr. Bennett had been engaged in autoerotic asphyxia, the practice of limiting the flow of oxygen to the brain in an attempt to heighten sexual pleasure, and that his death was an accident. (Pltf.Exh. B). The Post Mortem Report also stated that Mr. Bennett's death was due to asphyxia and that his death was an accident. (Pltf.Exh. C).

At the time of his death, Mr. Bennett was covered by a "Group Travel Policy" provided by his employer, Loral Corporation, as part of an employee welfare benefit plan falling within the ambit of ERISA. The policy was issued by the defendant, American International Life Assurance Company of New York. (Pltf.Exh. A).

Plaintiff, Theresa Bennett, was the decedent's wife and his beneficiary under the policy. Shortly after her husband's death, Mrs. Bennett presented her claim for benefits. By letter dated March 15, 1995, Defendant denied Mrs. Bennett's claim finding that "[t]he circumstances of [Mr. Bennett's] death point to the fact that he was risking his life by his own actions" and explaining that "death cannot be considered accidental if, his conduct was such that he should have anticipated that in all reasonable probability he could die as a result of his actions." (Pltf.Exh. E).

As required by ERISA, Plaintiff appealed the denial to Defendant's ERISA Appeals Committee. By letter dated August 15, 1995, Defendant's ERISA Appeals Committee upheld the denial of Plaintiff's claim. (Pltf.Exh. J). As the basis for the denial, the Appeals Committee letter cited the reasons given in the initial denial letter dated March 15, 1995. No other specific grounds for denial were set forth. (Pltf.Exh. J).

On December 6, 1995, Plaintiff filed the instant complaint alleging that the denial of benefits is a violation of ERISA. Presently before this Court are Plaintiffs' Motion for Summary Judgment and Defendant's Motion for Summary Judgment.

### A. Autoerotic Asphyxia

Autoerotic asphyxia refers to the practice of deliberately inducing hypoxia (a state of diminished oxygen supply to the brain) with the intention of producing sexual arousal. (Hucker Aff., Exh. 2). The Diagnostic and Statistical Manual of the American Psychiat-

ric Association (Fourth Edition), known as DSM–IV, refers to "asphyxiophilia" or "hypoxyphilia" as a mental disorder under the general rubric of Sexual Masochism. (Hucker Aff., Exh. 2). The DSM–IV describes the practice as follows:

> One particularly dangerous form of sexual masochism, called hypoxyphilia involves sexual arousal by oxygen deprivation obtained by means of chest compression, noose, ligature, plastic bag, mask, or chemical (often a volatile nitrate that produces a temporary decrease in brain oxygenation by peripheral vasodilation). Oxygen-depriving activities may be engaged in alone or with a partner. Because of equipment malfunction, errors in the placement of the noose or ligature, or other mistakes, accidental deaths sometimes occur. Data from the United States, England, Australia, and Canada indicate that one to two hypoxyphilia-caused deaths per million population are detected and reported each year.

DSM–IV § 302.83, at 529.

Plaintiff's expert Stephen Hucker writes that "[t]he prevalence of the behaviour is unknown but, like the present case, most come to light as fatalities." (Hucker Aff., Exh. 2). He goes on to note that "death is due to the failure of some mechanism or strategy that the practitioner thought was fail-safe. Sometimes the devise is quite complex but in others they have simply relied on their subjective awareness of losing consciousness to reverse the process by, for example, grabbing onto nearby supports or extending their legs to reduce the pressure on their neck and thereby avoid a fatal mishap." (Hucker Aff., Exh. 2).

## II. DISCUSSION

### A. Summary Judgment Standard & Standard of Review

Pursuant to Fed.R.Civ.P. 56(c), a court may grant summary judgment if it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Furthermore, it is the substantive law that will determine what facts are material to the outcome of a case. *See Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511–12.

Initially, the moving party has the burden of informing the court of the basis of its motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The Court must then resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). However, the non-moving party must do more than simply show "that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355–56. Only when the Court concludes that no rational finder of fact can find in favor of the non-moving party should summary judgment be granted. *Gallo v. Prudential Residential Servs., Ltd.,* 22 F.3d 1219, 1223 (2d Cir.1994).

Furthermore, under ERISA, "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989); *see also Schultz v. Metropolitan Life Ins. Co.,* 872 F.2d 676, 678 (5th Cir.1989).

Here, Plaintiff argues, and Defendant does not appear to dispute, that no such grant of authority was included in the instant policy. Thus, this Court will perform a *de novo* review of Defendant's denial of benefits. *Accord, Todd v. AIG Life Ins. Co.,* 47 F.3d 1448, 1451 (5th Cir.1995)

### B. Interpretation of ERISA Regulated Insurance Policies

The instant dispute essentially presents only one issue: whether Tim Bennett's death was an "accident" within the meaning of the

Group Travel Accident Policy (the "Policy") issued by Defendant.

■ The benefit provisions of an ERISA regulated insurance program must be interpreted under principles of federal substantive law. Congress, in adopting ERISA, expected that "a federal common law of rights and obligations under ERISA-regulated plans would develop." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S.Ct. 1549, 1558, 95 L.Ed.2d 39 (1987); *see also Firestone*, 489 U.S. at 110, 109 S.Ct. at 954. In ascertaining the applicable federal common law, a court may " 'draw guidance from analogous state law.' " *Brandon v. Travelers Ins. Co.*, 18 F.3d 1321, 1325 (5th Cir.1994) (*quoting McMillan v. Parrott*, 913 F.2d 310, 311 (6th Cir.1990)). However, "[i]n so doing, [a court] may use state common law as a basis for new federal common law ... only to the extent that state law is not inconsistent with congressional policy concerns." *Thomason v. Aetna Life Ins. Co.*, 9 F.3d 645, 647 (7th Cir.1993); *see also Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1257 n. 8 (3d Cir.1993); *Jamail, Inc. v. Carpenters Dist. Council of Houston Pension & Welfare Trusts*, 954 F.2d 299, 304 (5th Cir.1992).

Applying the basic tenets of contract interpretation, the first place to look for a definition is in the terms of the policy contract itself. *See Pilot Life*, 481 U.S. at 56–57, 107 S.Ct. at 1557–58. These terms must be given their plain meanings, meanings that comport with the interpretations given by the average person. *See, e.g., Wickman v. Northwestern Nat. Ins. Co.*, 908 F.2d 1077, 1084 (1st Cir.1990); *Hoffman v. Life Insurance Co.*, 669 P.2d 410, 416 (Utah 1983); *Knight v. Metropolitan Life Ins. Co.*, 103 Ariz. 100, 437 P.2d 416 (1968). "Courts have also held, nearly unanimously, 'that insurance contracts must be liberally construed in favor of a policyholder or beneficiary ... and strictly construed against the insurer in order to afford the protection which the insured was endeavoring to secure when he applied for the insurance.' " *Wickman*, 908 F.2d at 1084 (*quoting* 13 Appleman, Insurance Law and Practice § 7401 at 197 (1976)); *see also Howard v. Federal Crop Ins. Corp.*, 540 F.2d 695 (4th Cir.1976).

Turning to the policy in question, the Policy defines "injury" as "bodily injury caused by an *accident* and resulting directly and independently of all other causes in loss covered by the policy." (Pltf.Exh. A) (emphasis added). The Policy also contains a schedule of benefits payable; under the heading "Accidental Death and Dismemberment Indemnity," loss of life entitles the beneficiary to payment of the entire value of the policy. (Pltf.Exh. A). The instant policy also contains various exclusions from coverage, including loss due to "suicide or any attempt thereat by the Insured Person while sane" and loss due to "disease of any kind," but there is no general exclusion for self-inflicted injury. (Pltf.Exh. A).

### i. What is Meant by the Term "Accident"

As with all contractual terms, the Court looks first to the policy itself for a definition of the term "accident." Here, unfortunately, the Policy is silent. Accordingly, the Court must seek guidance from alternative sources.

In one of the more remarkable cases to deal with this issue, the Supreme Court distinguished between accidental means and accidental results in holding that a man who died of heat stroke while golfing had not died of *accidental means* in *Landress v. Phoenix Mutual Life Ins. Co.*, 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934 (1934) (no longer binding as federal common law after *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). The *Landress* Court reasoned that because the insured had intentionally played golf and exposed himself to the hot sun for a long period of time, the means of his death, overexposure to the sun, was not accidental. *Landress*, 291 U.S. at 491, 54 S.Ct. at 461. In dissent, Justice Cardozo harshly criticized what he termed an "artificial" distinction between accidental means and accidental results:

"Probably it is true to say that in the strictest sense and dealing with the region of physical nature there is no such thing as an accident." Halsburg, L.C. in *Brintons v. Turvey*, L.R. [1905]. . . . On the other hand, the average man is convinced that there is, and so certainly is the man who

takes out a policy of accident insurance. It is his reading of the policy that is to be accepted as our guide, with the help of the established rule that ambiguities and uncertainties are to be resolved against the company.... When a man has died in such a way that his death is spoken of as an accident, he has died because of an accident, and hence by accidental means.

*Landress*, 291 U.S. at 499, 54 S.Ct. at 463–64 (citations omitted).

Not surprisingly, courts have consistently rejected the distinction between accidental means and accidental results, noting that

it is illogical to purport to distinguish between the accidental character of the result and the means which produce it; that the distinction gives to "accidental means" a technical definition which is not in harmony with the understanding of the common man; and that the ambiguity found in the concept should be resolved against the insurer so as to permit coverage.

*Wickman*, 908 F.2d at 1086 (*quoting* 10 Couch on Insurance 2d § 41:31, 50 (1982)); *see also Page Flooring and Constr. Co. v. Nationwide Life Ins. Co.*, 840 F.2d 159, 162 (1st Cir.1988) (Coffin, J., dissenting) (rejecting the distinction between "accidental means" and "accidental results" as artificial and confusing).

As the First Circuit opined in *Wickman v. Northwestern Nat. Ins. Co.*, "[p]robably the best definition is Cardozo's tautology that an accident is what the public calls an accident, which aids jurists in deciding individual cases only slightly." 908 F.2d at 1086. Justice Musmanno of the Pennsylvania Supreme Court described our present conundrum as follows:

What is an accident? Everyone knows what an accident is until the word comes up in court. Then it becomes a mysterious phenomenon, and, in order to resolve the enigma, witnesses are summoned, experts testify, lawyers argue, treatises are consulted and even when a conclave of twelve world-knowledgeable individuals agree as to whether a certain set of facts made out an accident, the question may not yet be settled, and it must be reheard in an appellate court.

*Brenneman v. St. Paul Fire and Marine Ins. Co.*, 411 Pa. 409, 192 A.2d 745, 747 (1963); *see also Burr v. Commercial Travelers Mut. Acc. Ass'n*, 295 N.Y. 294, 301, 67 N.E.2d 248 (N.Y.1946) ("Philosophers and lexicographers have attempted definition with results which have been productive of immediate criticism. No doubt the average man would find himself at a loss if asked to formulate a written definition...."); *Wickman*, 908 F.2d at 1087 ("Much of the inconsistency in the case law defining and applying the definition of accident is traceable to the difficulty in giving substance to a concept which is largely intuitive.").

■  Returning to the case at bar, Defendant initially argues that Mr. Bennett's death could not have been "caused by an accident" because the injury was intentionally inflicted. To wit, because Mr. Bennett's intended "actions caused his fatal asphyxiation, [p]ursuant to the unambiguous terms of the policy, Mr. Bennett's beneficiary is not entitled to accidental death benefits." (Def's Mem. of Law at 6). This is simply a restatement of the accidental means versus accidental results distinction criticized by Justice Cardozo in *Landress*. Simply because Mr. Bennett intentionally sought to reduce the flow of oxygen to his brain does not necessarily mean that he intended to die, and the Court is not willing to adopt such a *per se* rule. *Accord, Todd,* 47 F.3d at 1452 ("having reviewed the sparse history and current knowledge of autoeroticism [the district court] did not believe that the cases dealing with such activities warranted such a *per se* rule.").

### C.  Is Death by Autoerotic Asphyxia an Accident under ERISA?

All of this Court's jurisprudential meandering has done little to resolve the ultimate question in this case, which is whether the injury that killed Mr. Bennett was an accident within the meaning of an ERISA regulated insurance policy where that policy is silent as to the term "accident." As this Court has noted, the word "accident" appears to have no single, universally accepted meaning. Accordingly, the Court turns to two general categories of cases for help. First,

the Court will examine state and federal cases dealing with autoerotic asphyxiation; although these cases are not ERISA cases, and therefore not binding as federal common law on this issue, they provide important background. The second category of cases are ERISA cases that have grappled with the precise meaning of "accidental" death.

### i. Non–ERISA Cases

Not surprisingly, few cases have dealt with autoerotic asphyxia. One of the earliest state law cases dealing with autoerotic asphyxiation is *International Underwriters, Inc. v. Home Ins. Co.,* 662 F.2d 1084 (4th Cir.1981). In *International Underwriters,* the Fourth Circuit denied coverage, concluding that

> death was the natural result of a voluntary act unaccompanied by anything unforeseen except death or injury. [The decedent] is bound to have foreseen that death or serious bodily injury could have resulted when he voluntarily induced unconsciousness with a noose around his neck. We are thus of the opinion that his death was not an accident under Virginia law.

662 F.2d at 1087; *see also Runge v. Metropolitan Life Ins. Co.,* 537 F.2d 1157 (4th Cir.1976) (finding that death was not accidental under Virginia law).

Similarly, in *Sigler v. Mutual Benefit Life Ins. Co.,* 663 F.2d 49 (8th Cir.1981), the Eighth Circuit rejected coverage for an autoerotic death based both on a self-inflicted injury exclusion in the policy and on its view that the death was not accidental "since a reasonable person would have recognized that his action *could* result in his death." *Sigler,* 663 F.2d at 49 (emphasis added).

In a third state law case, the Fifth Circuit, relying on Louisiana law, denied coverage in *Sims v. Monumental General Insurance Company,* 960 F.2d 478 (5th Cir.1992). However, in *Sims,* the Fifth Circuit denied recovery not because the death was ruled non-accidental, an issue the court carefully avoided, but because the policy expressly did not cover losses, including death, "resulting directly or indirectly, wholly or partly from [an] intentionally self inflicted injury." 960 F.2d at 478.

Because there is no self-inflicted injury exclusion in the instant policy, and because the *Sims* court never reached the issue of accidental death, its reasoning is of little value here. However, both *Int'l Underwriters* and *Sigler* did reach the issue of whether death by autoerotic asphyxiation is accidental. In *Int'l Underwriters* and *Sigler,* the decision to deny coverage appeared to turn on the courts' conclusion that where a reasonable person would have recognized that his action *could* result in his death, the death is not accidental.

This "could result in death test" is nothing more than a glossed over version of the *Landress* Court's accidental means/results distinction. For example, almost every activity arguably "could result in death," including driving a car on a winter day or walking across a busy street. Under this test, a pedestrian who is hit by an automobile is not entitled to accidental benefits because a reasonable person would have recognized that crossing the street "could result in death." As Justice Cardozo aptly noted in *Landress,* "[p]robably it is true that in the strictest sense ... there is no such thing as an accident."

Not surprisingly, most courts appear to reject this test. For example, in *Kennedy v. Washington Nat'l Ins. Co.,* 136 Wis.2d 425, 401 N.W.2d 842, 846 (1987), the Wisconsin Court of Appeals ruled that a death from autoeroticism was accidental. In doing so, the Wisconsin Court of Appeals specifically rejected the notion that death could not be accidental if it was merely a foreseeable or natural result of a force or event voluntarily set in motion by the insured. Instead, in the *Kennedy* court's view it was not enough that the act *might or could* have caused the injury or death; only "when an insured participates in some act where serious injury or death is *highly probable* or an inevitable result" can the result of his conduct be held not to be accidental. 401 N.W.2d at 846 (emphasis added). As the *Kennedy* court remarked, autoerotic activity may be risky, but death is not a normal, expected result of this behavior; thus it is not of such a nature that the decedent knew or should have known that it

probably would have resulted in death. *Kennedy,* 401 N.W.2d at 846.

A similar standard was articulated in *Connecticut General Life Insurance Company v. Tommie,* 619 S.W.2d 199 (Tex.Civ.App.1981). In *Tommie,* the plaintiff relied on two experts, both of whom testified that death is not the normal or expected result of this type of autoerotic activity but would be considered unusual or unexpected. 619 S.W.2d at 202. The *Tommie* court affirmed the jury verdict that the death was accidental, ruling that it could be otherwise only " 'when the consequences of the act are so natural and probable as to be expected by any reasonable person' " and were, in effect, intended by the insured. 619 S.W.2d at 202 (*quoting Freeman v. Crown Life Ins. Co.,* 580 S.W.2d 897 (Tex.Civ.App.1979)); *cf. Republic Nat'l Life Ins. Co. v. Heyward,* 536 S.W.2d 549, 557 (Tex.1976) ("injuries are 'accidental' and within the coverage of an insurance policy ... if, from the viewpoint of the insured, the injuries are not the natural and probable consequence of the action or occurrence which produced the injury; or in other words, if the injury could not reasonably be anticipated by [the] insured, or would not ordinarily flow from the action or occurrence which caused the injury").

Plainly, in comparison with *International Underwriters* and *Sigler,* the tests articulated in *Kennedy* and *Tommie* are more in line with the common man's understanding of the term "accident," as well as being intuitively more sound. The question remains however, whether the common man's understanding of the term "accident" is the law under ERISA.

### ii. ERISA Case Law

The Court now turns to ERISA cases that have grappled with the precise meaning of "accidental" death. One of the more cogent cases addressing the meaning of "accident" in the context of ERISA regulated plans, and indeed the case upon which Defendant primarily relies, is *Wickman v. Northwestern Nat'l Ins. Co.,* 908 F.2d 1077 (1st Cir.1990). In *Wickman,* the deceased climbed over a bridge guardrail and was holding on with one hand when he fell and later died from his injuries. 908 F.2d at 1080. The First Circuit affirmed the decision of the magistrate who had found that serious bodily injury was substantially certain to happen and that "Wickman knew or should have known that serious bodily injury was a probable consequence *substantially likely* to occur as the result" of his conduct. *Wickman,* 908 F.2d at 1081. This finding, the First Circuit said, "equates with a determination either that Wickman expected the result, or that a reasonable person in his shoes would have expected the result, and that any other expectation would be unreasonable." *Wickman,* 908 F.2d at 1089.

After an extensive analysis of state and federal cases interpreting the term "accident," the *Wickman* court crafted a two step test for determining whether benefits are payable:

> If the fact-finder determines that the insured did not expect an injury similar in type or kind to that suffered, the fact-finder must then examine whether the suppositions which underlay that expectation were reasonable. This analysis will prevent unrealistic expectations from undermining the purpose of accident insurance. If the fact-finder determines that the suppositions were unreasonable, then the injuries shall be deemed not accidental. The determination of what suppositions are unreasonable should be made from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences.

*Wickman,* 908 F.2d at 1088 (citations omitted).

The *Wickman* court noted, however, that oftentimes a fact-finder cannot ascertain an insured's subjective expectation. In that situation, the ultimate determination rests on "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as *highly likely to occur* as a result of the insured's intentional conduct." 908 F.2d at 1088. Indeed, this is the test that *Wickman* has been cited as articulating.

However, the *Wickman* test has been criticized in one of the few ERISA cases interpreting an accidental injury clause where the

claimed loss was a death connected with autoerotic activity. In *Parker v. Danaher Corp.*, 851 F.Supp. 1287 (1994), the United States District Court for the Western District of Arkansas wrote that "we find the *Wickman* subjective/objective analysis sheds little light in an area of the law already unduly complicated by reference to various artificial distinctions." 851 F.Supp. at 1295.

After examining in some detail the cases involving claims under accidental death policies in which the fatalities resulted from autoerotic activities, the *Parker* court noted that these cases were not ERISA cases and apparently found nothing in them persuasive enough to decide the case before it. As a result, the court concluded:

> In keeping with the directions of the Eighth Circuit and the teachings of Justice Cardozo in his dissent in *Landress,* we believe the common man on the street regards an accident as being something unintended, not according to the usual course of things, or not as expected.

*Parker*, 851 F.Supp. at 1295.

Applying this test to the facts before it, the *Parker* court held that "[i]n this case, it is undisputed that the insured did not *expect to die* as a result of performing the autoerotic act. Rather, the insured was merely involved in an act designed to enhance his sexual gratification.... We believe that in the common understanding of man Timothy Parker's death would be regarded as an accident." 851 F.Supp. at 1295 (emphasis added).

Other than *Parker*, only one other federal court has interpreted and applied an accidental injury clause in connection with an ERISA employee benefit plan where the claimed loss was a death connected with autoerotic activity. In *Todd v. AIG Life Insurance Co.*, 47 F.3d 1448 (5th Cir.1995), the Fifth Circuit affirmed the district court's finding that a death by autoerotic asphyxia was accidental. In doing so, the *Todd* court specifically addressed the standard stated in *Parker*, and wrote that "the *Parker* definition of accident is not inconsistent with some dictionary definitions. Moreover, the First Circuit, in *Wickman*, seemed to indicate that the narrower definition had some support in the common law and took pains to explain it away." *Todd*, 47 F.3d at 1455–56 n. 8 (citation omitted). However, the Fifth Circuit declined to adopt the *Parker* standard, remarking that:

> Although Mrs. Todd was familiar with *Wickman*, we fail to find an argument for this more favorable definition in her written papers in the record before the district court, and the argument is not presented here. Indeed, in both courts, Mrs. Todd was and is content to submit that her husband's death was not only unintended and unexpected, but also that his expectation was quite reasonable.

*Todd*, 47 F.3d at 1456 n. 8.

The Fifth Circuit also performed an extensive analysis of caselaw dealing with accidental death and, as other courts before it had done, found those cases largely unavailing. *See Todd*, 47 F.3d at 1452–56. Instead, both the circuit court in *Todd*, and the district court below it, relied heavily on *Wickman*. The Fifth Circuit noted that the district court below had mistakenly interpreted *Wickman*, when it concluded that the risk of death involved in the conduct at issue must reach the level of *"substantial certainty"* before the resulting death could be deemed nonaccidental. *Todd*, 47 F.3d at 1456. The *Todd* court, however, found this switch in words to be inconsequential because "the district court also quoted the magistrate's words, which surely have the same import, describing the triggering risk to be that death was *substantially likely* to occur from the insured's volitional act, which the court of appeals [in *Wickman*] in turn observed was the equivalent of 'highly likely to occur.'" 47 F.3d at 1456.

Arguments concerning semantics aside, based on a reading of *Wickman* and *Todd*, it is clear that the Fifth Circuit views "substantial certainty," "substantially likely," and "highly likely" as synonymous phrases. In the end, the Fifth Circuit concluded:

> The district court here followed the essence of *Wickman:* for death under an accidental death policy to be deemed an accident, it must be determined (1) that the deceased had a subjective expectation

of survival, and (2) that such expectation was objectively reasonable, which it is if death is not *substantially certain* to result from the insured's conduct.

*Todd,* 47 F.3d at 1456 (emphasis added).

The *Todd* court then applied this test to the facts before it. After examining the record, the Fifth Circuit stated that "the materials before the court clearly indicated that the likelihood of death from autoerotic activity falls far short of what would be required to negate coverage under the policy we have before us." *Todd,* 47 F.3d at 1456. The *Todd* court made specific reference to a treatise on autoerotic deaths, in which the authors observed that "[a]utoerotic or sexual asphyxia refers to the use of asphyxia to heighten sexual arousal, more often than not with a nonfatal outcome." 47 F.3d at 1457 (*quoting* Hazelwood, Dietz & Burgess, Autoerotic Fatalities 49 (1983)). In addition, the *Todd* court quoted an article by Jane Brody in the New York Times of March 27, 1984, observing that, "according to researchers, '[i]n a small but significant number of cases' of autoeroticism, 'the person dies before he can restore his oxygen supply.' " 47 F.3d at 1457.

Consequently, the Fifth Circuit affirmed the district court's grant of summary judgment for the plaintiff finding that, as a matter of law, the risk of death from autoerotic asphyxiation is not sufficient to deny coverage as nonaccidental. *See Todd,* 47 F.3d at 1457. As a postscript, the *Todd* court remarked: "The life insurance companies have ample ways to avoid judgments like this one." 47 F.3d at 1457.

Although Defendant argues otherwise, this Court does not perceive that the legal standards articulated in *Wickman* and *Todd,* the two leading cases in this area, are in conflict. In *Wickman,* the court stated the standard as whether "Wickman knew or should have

known that serious bodily injury was a probable consequence *substantially likely* to occur as the result" of his conduct. 908 F.2d at 1081 (emphasis added). In comparison, in *Todd* the court stated the standard as whether death is "*substantially certain* to result from the insured's conduct." 47 F.3d at 1456 (emphasis added).

The difference between substantially *likely* and substantially *certain,* although important to lexicologists, is of little bearing here. Moreover, the differing results in the two cases can be explained by their markedly divergent facts. In *Wickman,* the deceased climbed over a bridge guardrail and was holding on with one hand when he fell and later died from his injuries. 908 F.2d at 1080. Whereas in *Todd,* the deceased was found alone on his bed with a tightened collar around his neck that was attached by a leash to his ankle. 47 F.3d at 1450.

Applying its standard to the facts, the *Wickman* court concluded that "given the height of the bridge, the narrow foothold, that Wickman possessed no extraordinary gymnastic, acrobatic, or other athletic skills, and the absence of evidence that would have enabled him to hold on," a reasonable person would have "*expected to die* or be seriously injured." 908 F.2d at 1089 (emphasis added).[1]

In contrast, the *Todd* court concluded, based on the scientific evidence, that although "[t]he record is silent on whether and how often Todd had previously practiced this conduct without dying[,] the materials before the court clearly indicated that the likelihood of death from autoerotic activity falls far short of what would be required to negate coverage under the policy we have before us. . . . 'Death was not a normal expected result of the behavior.' " 47 F.3d at 1456–57 (citation omitted).

---

1. In fact, the First Circuit found that based on the facts before it, the "substantially likely" standard was easily met, remarking:

> [The plaintiff] largely concedes that a reasonable person in Wickman's shoes would have expected to die or be seriously injured as a result of climbing over the guardrail and hanging on with only one hand. Such a concession, given the height of the bridge, the narrow

foothold, that Wickman possessed no extraordinary gymnastic, acrobatic, or other athletic skills, and the absence of evidence that would have enabled him to hold on, is not surprising. Thus, the magistrate's conclusion that Wickman's death was to be reasonably expected is not clearly erroneous.

*Wickman,* 908 F.2d at 1089.

Although this Court does not see the two standards as entirely synonymous, they are clearly not in conflict. Indeed, the *Todd* court specifically stated that its standard was equivalent to the standard articulated in *Wickman. See Todd*, 47 F.3d at 1456 ("The district court here followed the essence of *Wickman*.").

■ Accordingly, this Court adopts the two part test outlined in *Todd* for determining whether death is accidental. However, to allay any concerns by Defendant and to avoid any semantic challenges, this Court will use *Wickman's* "substantially likely" language in the second prong of the test. This Court thus adopts the following standard in ERISA benefit cases: For death under an accidental death policy to be deemed an accident, it must be determined (1) that the deceased had a subjective expectation of survival, and (2) that such expectation was objectively reasonable, which it is if death is not *substantially likely* to result from the insured's conduct.

### iii. Was Mr. Bennett's Death an Accident?

■ Returning to the evidence here, it is undisputed that Mr. Bennett intended to reduce the flow of blood and oxygen to his brain, thereby creating the condition of asphyxia. However, it does not necessarily follow that Mr. Bennett intended to lose consciousness.

In this case, even assuming that Mr. Bennett intended the degree of injury from asphyxia that would cause him to lose consciousness, this condition is not an injury that invariably leads to death. As Plaintiff's expert notes, "most practitioners likely survive the experience and expect to repeat it again." (Hucker Aff., Exh. 2). Moreover, the DSM–IV states that "[b]ecause of equipment malfunction, errors in the placement of the noose or ligature, or other mistakes, *accidental deaths sometimes occur*." DSM–IV § 302.83, at 529 (emphasis added). Thus, according to the DSM–IV death sometimes does not occur, and when it does it is considered accidental.

On the issue of whether Mr. Bennett had a subjective expectation of survival, Plaintiff offers numerous affidavits in support of her Motion for Summary Judgment that provide circumstantial evidence of this expectation. Mr. Butterworth, the last person to see Mr. Bennett alive, observed that Mr. Bennett appeared to be his normal self and did not give any indication of being under stress or depression. (Butterworth Aff. ¶ 5). Butterworth also recalled that Mr. Bennett purchased gifts for his family while on the trip and was looking forward to delivering those gifts when he returned home. (Butterworth Aff. ¶ 5). Also on November 15, 1994, Mr. Bennett made plans to visit an old friend who lived in the area, Ralph Albano, on the evening of November 16, 1994. (Albano Aff. ¶ 4).

In opposition, Defendant argues that Mr. Bennett intended to die, or at a minimum that he had a self-injurious motive. Specifically, Defendant points to the fact that no "mechanism" for escape was apparent, and to Defendant's expert's testimony that the absence of ejaculation supports a finding that the insured had a self-injurious motive. Even assuming *arguendo* that Mr. Bennett had a self-injurious motive or was too myopic to plan an appropriate escape, more is necessary to elevate these facts to the point where a fact-finder can conclude that Mr. Bennett intended to die.

Defendant's expert does not state that Mr. Bennett intended to die. In fact, Dr. Miskin's affidavit supports just the opposite conclusion: "the pursuit of a practice bordering on a *near fatal* outcome is a significant part of the pleasure and gratification associated with the act." (Miskin Aff. ¶ 4) (emphasis added). Defendant provides no other evidence supporting an inference that Mr. Bennett intended to die.

Thus, Defendant has failed to come forward with specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56. Accordingly, this Court finds, as a matter of law, that Mr. Bennett had a subjective expectation of survival.

The Court is now left with the more difficult task of determining if Mr. Bennett's expectation of survival was objectively rea-

sonable: ie. if a reasonable person would conclude that death is not *substantially likely* to result from Mr. Bennett's conduct.

Here, what killed Mr. Bennett was not merely the loss of consciousness from the temporary lack of oxygen in his brain; it was the further injury to the brain and other bodily functions caused by the *prolonged lack of oxygen-laden blood.* Plaintiff's expert Stephen Hucker writes that "death is due to the failure of some mechanism or strategy that the practitioner thought was fail-safe. Sometimes the devise is quite complex but in others they have simply relied on their subjective awareness of losing consciousness to reverse the process by, for example, grabbing onto nearby supports or extending their legs to reduce the pressure on their neck and thereby avoid a fatal mishap." (Hucker Aff., Exh. 2).

The experts in the *Tommie* case testified similarly that death from the practice would be considered unusual, *see* 619 S.W.2d at 202, and the court in the *Kennedy* case ruled that the risk of death from autoerotic practice is "not of such a nature that [the decedent] knew or should have known that it probably would result in death. Death was not a normal expected result of the behavior." 401 N.W.2d at 845.

However, in opposition, Defendant's expert, Dr. Solomon Miskin, opines:

It is my opinion that the death of Timothy J. Bennett was not an accident. The danger of suffocation inherent with asphyxophilia magnifies the sense of sexual arousal and appears to be a direct contributory factor in heightening the intensity of the experience. It is my opinion that Timothy J. Bennett, as a practitioner of asphyxophilia, was well acquainted with the potential danger of suffocation connected to his behavior.

(Miskin Aff. ¶ 4).

In determining whether an expectation of survival is reasonable, the *Wickman* court stated that a court should make this assessment from the perspective of "a reasonable person, with background and characteristics similar to the insured." 908 F.2d at 1088. In this regard, Dr. Solomon's opinion cuts both ways. When Dr. Solomon states that "Bennett, as a practitioner of asphyxophilia, was well acquainted with the potential danger of suffocation connected to his behavior," he necessarily implies that Bennett must have survived previous incidents. Plaintiff's expert is more direct: "At the age of thirty two [Mr. Bennett] would almost certainly have been aware of his unusual sexual interest for a number of years and to have engaged in this behaviour on many previous occasions." (Hucker Aff., Exh. B).

Because it logically follows that Mr. Bennett's previous participation in these activities did not result in death, the fact-finder in this case must weigh the practitioner's previous experiences—resulting in survival—in the determination of whether death was substantially likely to result from Mr. Bennett's conduct. Other courts have applied a similar standard in analogous situations. *See, e.g., Ward v. Penn Mutual Life Ins. Co.,* 352 S.W.2d 413, 423 (Mo.Ct.App.1961) (finding accident where man fell off top of moving car; he had performed the stunt previously, knew, and trusted the driver, was strong, and had a good grip); *Oldring v. Metropolitan Life Ins. Co.,* 492 F.Supp. 994 (D.N.J. 1980) (finding an accident where owner experienced in use of gun, after having examined the gun and thinking it was empty, pointed and fired the gun at his head, killing himself); *Knight v. Metropolitan Life Ins. Co.,* 103 Ariz. 100, 437 P.2d 416 (1968) (finding accidental the death of professional diver after diving off the Coolidge Dam; he previously had completed the same dive without injury).

Nevertheless, in light of the expert testimony before the Court, and mindful that the Court must resolve all ambiguities against the moving party, the Court cannot conclude that there are no genuine issues of material fact as to whether Mr. Bennett's subjective expectation of survival was objectively reasonable. Accordingly, both parties' motions for summary judgment must be denied.

### D. Exclusion of Benefits Due to Suicide or Disease

■ Defendant also moves this Court for summary judgment on the basis that Plain-

tiff's claim is excluded because Mr. Bennett's death was the result of suicide or disease. As to Defendant's argument that Mr. Bennett committed suicide, this argument is subsumed under the previously stated accident test: that the insured have a subjective expectation of survival. If Mr. Bennett expected to survive, then his death was not the result of suicide. Because the Court has already determined as a matter of law that Mr. Bennett had a subjective expectation of survival, Defendant's suicide argument is simply redundant.

As to Defendant's assertion that Mr. Bennett's death was caused by or resulted from disease, Defendant offers no evidence whatsoever that Mr. Bennett had either a physical or mental disease that might have caused his death. Consequently, this affirmative defense, if it can be so described, is without merit and must also be dismissed.

## III. CONCLUSION

In summary, the Court finds that genuine issues of material fact exist as to whether Mr. Bennett's death was an accident. Defendant's assertion that Mr. Bennett's death resulted from or was caused by either suicide or disease is without merit.

It is therefore **ORDERED** that Plaintiff's Motion for Summary Judgment is GRANTED IN PART dismissing Defendant's affirmative defense that the present loss is excluded under the Policy's suicide and disease exclusions. Defendant's Motion for Summary Judgment is DENIED.

**IT IS SO ORDERED.**