**Carol C. HOWARD, Plaintiff,**

v.

**NATIONAL EDUCATION ASSOCIATION OF NEW YORK and Hartford Life Insurance Company, Defendants.**

No. 94–CV–0214.

United States District Court, N.D. New York.

Sept. 9, 1997.

---

Feit, Schlenker Law Firm, Dennis B. Schlenker, of counsel, Albany, NY, for Plaintiff.

Aswad, Ingraham Law Firm, William M. Thomas, of counsel, Binghamton, NY, for Defendant National Education Association of New York.

Coughlin, Gerhart Law Firm, Frank W. Miller, of counsel, Binghamton, NY, for Defendant Hartford Life Insurance Company.

## MEMORANDUM–DECISION and ORDER

McAVOY, Chief Judge.

This case concerns a dispute over benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Specifically, the dispute involves the construction of the term "accidental" in an accidental death insurance policy and arises from the death of Plaintiff's husband. Defendant Hartford Life Insurance Company ("Hartford Life") declined to pay the policy's benefits after concluding that the death was not accidental.

Plaintiff Carole Howard originally filed this action in New York State Supreme Court, Broome County, but defendants National Education Association of New York ("NEANY") and Hartford Life removed the case to this Court pursuant to 28 U.S.C. § 1441. Between May 19, 1997 and May 22, 1997, the Court held a bench trial on Plaintiff's claims. The Court's findings of fact and conclusions of law follow.

## I. FINDINGS OF FACT

Richard Howard, Plaintiff's deceased husband, was an employee of defendant NEANY. He was also a member of the Staff Organization of New York Educators ("SONYE"), the recognized collective bargaining unit for employees of NEANY. Pursuant to a collective bargaining agreement between NEANY and SONYE, NEANY provided Mr. Howard with life insurance, accidental death and dismemberment insurance, and common carrier coverage at no cost. Plaintiff is the beneficiary of the insurance policy issued by defendant Hartford Life upon Mr. Howard ("the Policy").

Richard Howard was hired by NEANY in 1976 as a Uniserve Representative in the Rochester District. In 1978, he became the Coordinator of Research for NEANY. In 1986, Mr. Howard voluntarily transferred to Vestal, New York to resume the position of Uniserve Representative. Until of the time of his death at the age of 49, Mr. Howard was employed by NEANY as a Uniserve Representative.

As a Uniserve Representative, Richard Howard was responsible for assisting the various bargaining units within NEANY in contract negotiations with their respective school districts. Initially, Mr. Howard's territory included the service area surrounding Ithaca, New York. However, as the evidence at trial made clear, Mr. Howard's geographic territory and workload significantly increased each year after he began work as Uniserve Representative in Vestal. In 1988, Mr. Howard was responsible for thirteen local unions, including nine teachers associations. In 1989, Mr. Howard was responsible for seventeen local unions.

In the Spring of 1989, Richard Howard injured his knee and was unable to work from March until July. As a result of Mr. Howard's knee surgery he underwent a routine pre-operative examination by his primary care physician, Dr. Frank Floyd, on April 13, 1989. Dr. Floyd recorded Mr. Howard's weight as 257 lbs; Dr. Floyd testified that he considered Richard Howard to be obese. Dr. Floyd also testified that his examination showed Mr. Howard to have a history of high blood pressure and elevated cholesterol. In addition, an EKG was performed. Although the EKG showed signs of sinus arrhythmia, Dr. Floyd testified that he considered Mr. Howard's EKG to be within the range of normal.

Plaintiff provided extensive evidence, much of which was unchallenged, that after Mr. Howard's knee injury, his workload began to exact a toll on him. In the fall of 1989, Carole Howard testified that Mr. Howard appeared exhausted and that her husband often expressed frustration with his workload. Carole Howard also stated that Mr. Howard began spending a large portion of his day driving to the many school districts in his territory and that he installed a telephone in their bedroom so that he could catch up on work-related telephone calls in the evenings. Mrs. Howard testified that in the Spring of 1990 her husband was growing increasing irritable and that he expressed to her that he felt he was "in over his head"; that he was carrying a heavier workload than the other Uniserve Representatives; and that he was not getting enough support from his coworkers.

On June 13, 1990, Richard Howard experienced heart palpitations and was examined by his primary care physician, Dr. Frank Floyd. Dr. Floyd administered an EKG in his office, which revealed that Richard Howard was experiencing atrial fibrillation. Mr. Howard was taken to Lourdes Hospital where a second EKG was performed; the second EKG showed that his heart rhythm had returned to normal. Upon admission to Lourdes Hospital, Richard Howard's weight was 264 lbs, and Dr. Floyd testified that Mr. Howard's blood pressure and cholesterol were borderline elevated. Richard Howard was placed on Digoxin, a heart medication, and released from the hospital on June 15, 1990.

On August 10, 1990, Richard Howard went to a cardiologist for a follow-up examination. Dr. John DiMenna performed a stress test and thallium scan. Richard Howard's stress test EKG showed an abnormal heart rhythm and ST-segment depression. Dr. DiMenna testified that because the abnormal EKG may have been due to Mr. Howard's heart medication, he had Richard Howard undergo a thallium scan (the use of a radioactive isotope to measure blood flow in the heart). Dr. DiMenna testified that the thallium scan was within the range of normal and he concluded that Richard Howard did not suffer from coronary disease. No further tests were conducted.

On the morning of September 23, 1990, while in bed with his wife, Richard Howard died. No autopsy was performed. Mr. Howard's Death Certificate lists the cause of death as ventricular arrhythmia, coronary atherosclerosis, and myocardial infarction. At the time of his death, Richard Howard's salary was $64,347. Plaintiff filed a claim for

accidental death benefits with Hartford Life, but the company denied payment on the claim. Defendant's proffered reason for the denial was that Mr. Howard died from heart disease rather than an "accident."

The policy in effect at the time of Richard Howard's death stated:

The Hartford will pay a benefit according to the schedule of Losses and Benefits on page 17 if:

(1) you suffer accidental bodily injury while your insurance is in force;

(2) a loss results directly from such injury, independent of all other causes; and

(3) such a loss occurs within 90 days after the date of the accident causing the injury.

No benefits will be paid for a loss caused by:

(1) sickness;

(2) disease;

(3) any medical treatment for items (1) or (2);

(4) any infection, except a pyogenic infection of an accidental cut or wound;

(5) war or any act of war, whether war is declared or not;

(6) any intentionally inflicted injury, suicide, suicide attempt, whether sane or insane . . .

(Ex. DH 119).

During the four-day non-jury trial, Plaintiff called six witnesses, including Richard Howard's co-workers, his primary care physician, and the consulting cardiologist. Considerable testimony was devoted to the nature and stresses involved in Richard Howard's work as a Uniserve Representative for NEANY. The Court finds this testimony credible and persuasive, and accordingly concludes that for at least two years preceding his death, Richard Howard was under enormous job related stress. He drove extensively, worked late hours, spent considerable time on the telephone while at home, and often worked weekends.

As to the cause of Mr. Howard's death, Plaintiff's two expert witness, Drs. Floyd and DiMenna, each testified that in their opinion Mr. Howard did not suffer from coronary disease and that the specific event that caused Richard Howard's death was ventricular arrhythmia. However, the doctors were unable to offer an opinion as to the cause of Mr. Howard's fatal arrhythmia. In fact, Plaintiff's doctors appeared to undercut her assertion that work-related stress caused Richard Howard's death.

When Dr. Floyd, Mr. Howard's primary care physician, was asked his opinion as to the cause of Richard Howard's death, he answered "sudden cardiac death syndrome." However, when Dr. Floyd was asked by Plaintiff's counsel if he could state with a reasonable degree of medical certainty what caused Richard Howard's "sudden cardiac death," he stated that he could not state the cause. When Plaintiff's counsel asked Dr. Floyd if stress might be a contributing factor, he answered that it could be, but he went on to state that stress was likely "not a primary cause." Instead, Dr. Floyd listed a number of possible contributory factors, including age, cholesterol, hypertension, and obesity.

The consulting cardiologist, Dr. DiMenna, testified that in his opinion Richard Howard's death was the result of ventricular fibrillation. However, when Dr. DiMenna was asked on direct examination whether he could state with a reasonable degree of medical certainty what caused Richard Howard's ventricular fibrillation, he stated that he could not state the cause. In a similar fashion to Dr. Floyd, Dr. DiMenna discussed a number of contributory risk factors, including age, cholesterol, hypertension, and obesity.

Defendant Hartford Life presented only one witness, Dr. David Nash. Dr. Nash testified that Richard Howard died from multivessel arteriosclerotic heart disease, which was caused by multiple risk factors, including Richard Howard's history of hypertension, high overall cholesterol, low high-density lipoprotein cholesterol, high triglycerides, and obesity. Based on these risk factors and Richard Howard's medical file, Dr. Nash concluded that Richard Howard's fatal cardiac arrhythmia was caused by arteriosclerotic heart disease. Furthermore, Dr. Nash testified that in his opinion durational stress (i.e.,

general work-related stress) has no correlation with sudden cardiac death.

## II. CONCLUSIONS OF LAW

### A. Standard of Review under ERISA

■ Under ERISA, "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989); *see also Schultz v. Metropolitan Life Ins. Co.,* 872 F.2d 676, 678 (5th Cir.1989).

Here, this Court previously ruled on Defendants' Motion to Dismiss that the Court will perform a *de novo* review of Hartford Life's denial of benefits. *See Howard v. Nat'l Ed. Ass'n of N.Y.,* 911 F.Supp. 48 (N.D.N.Y.1995). Accordingly, the following is the Court's *de novo* review of Hartford Life's decision to deny benefits.

### B. Interpretation of ERISA Regulated Insurance Policies

The instant dispute essentially presents only one issue: whether Richard Howard's death was an "accident" within the meaning of the Policy issued by Hartford Life.

■ The benefit provisions of an ERISA regulated insurance program must be interpreted under principles of federal substantive law. Congress, in adopting ERISA, expected that "a federal common law of rights and obligations under ERISA–regulated plans would develop." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56, 107 S.Ct. 1549, 1557–58, 95 L.Ed.2d 39 (1987); *see also Firestone,* 489 U.S. at 110, 109 S.Ct. at 954. In ascertaining the applicable federal common law, a court may " 'draw guidance from analogous state law.' " *Brandon v. Travelers Ins., Co.,* 18 F.3d 1321, 1325 (5th Cir.1994) (*quoting McMillan v. Parrott,* 913 F.2d 310, 311 (6th Cir.1990)). However, "[i]n so doing, [a court] may use state common law as a basis for new federal common law ... only to the extent that state law is not inconsistent with congressional policy concerns." *Thoma-*

*son v. Aetna Life Ins. Co.,* 9 F.3d 645, 647 (7th Cir.1993); *see also Heasley v. Belden & Blake Corp.,* 2 F.3d 1249, 1257 n. 8 (3d Cir.1993); *Jamail, Inc. v. Carpenters Dist. Council of Houston Pension & Welfare Trusts,* 954 F.2d 299, 304 (5th Cir.1992).

■ Applying the basic tenets of contract interpretation, the first place to look for a definition is in the terms of the policy contract itself. *See Pilot Life,* 481 U.S. at 56–57, 107 S.Ct. at 1557–58. These terms must be given their plain meanings, meanings that comport with the interpretations given by the average person. *See, e.g., Wickman v. Northwestern Nat. Ins. Co.,* 908 F.2d 1077, 1084 (1st Cir.1990); *Hoffman v. Life Insurance Co.,* 669 P.2d 410, 416 (Utah 1983); *Knight v. Metropolitan Life Ins. Co.,* 103 Ariz. 100, 437 P.2d 416 (1968). "Courts have also held, nearly unanimously, 'that insurance contracts must be liberally construed in favor of a policyholder or beneficiary ... and strictly construed against the insurer in order to afford the protection which the insured was endeavoring to secure when he applied for the insurance.' " *Wickman,* 908 F.2d at 1084 (*quoting* 13 Appleman, Insurance Law and Practice § 7401 at 197 (1976)); *see also Howard v. Federal Crop Ins. Corp.,* 540 F.2d 695 (4th Cir.1976).

Turning to the policy in question, Hartford Life is obligated to pay benefits for "accidental bodily injury ... [if] a loss results directly from such injury, *independent of all other causes.*" (Ex. DH 119) (emphasis added). The instant policy also contains various exclusions from coverage, including loss due to "sickness" or "disease." (Ex. DH 119). Unfortunately, the Policy does not define the term "accidental." Thus, the Court must seek guidance from alternative sources.

In a case similar to the present one, this Court was forced to decide whether death by autoerotic asphyxiation was an "accident" under the terms of an ERISA benefit plan. *See Bennett v. American Int'l Life Assurance Co.,* 956 F.Supp. 201 (N.D.N.Y.1997). In *Bennett,* we quoted from Justice Cardozo's dissent in *Landress v. Phoenix Mutual Life Ins. Co.,* 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934 (1934), wherein he stated:

"Probably it is true to say that in the strictest sense and dealing with the region of physical nature there is no such thing as an accident." Halsburg, L.C. in *Brintons v. Turvey*, L.R. [1905].... On the other hand, the average man is convinced that there is, and so certainly is the man who takes out a policy of accident insurance. It is his reading of the policy that is to be accepted as our guide, with the help of the established rule that ambiguities and uncertainties are to be resolved against the company.... When a man has died in such a way that his death is spoken of as an accident, he has died because of an accident, and hence by accidental means.

*Bennett*, 956 F.Supp. at 205–06 (*quoting Landress*, 291 U.S. at 499, 54 S.Ct. at 463–464 (citations omitted)).

In *Wickman v. Northwestern Nat. Ins. Co.*, the First Circuit opined that "[p]robably the best definition is Cardozo's tautology that an accident is what the public calls an accident, which aids jurists in deciding individual cases only slightly." 908 F.2d at 1086. Justice Musmanno of the Pennsylvania Supreme Court described the issue as follows:

What is an accident? Everyone knows what an accident is until the word comes up in court. Then it becomes a mysterious phenomenon, and, in order to resolve the enigma, witnesses are summoned, experts testify, lawyers argue, treatises are consulted and even when a conclave of twelve world-knowledgeable individuals agree as to whether a certain set of facts made out an accident, the question may not yet be settled, and it must be reheard in an appellate court.

*Brenneman v. St. Paul Fire and Marine Ins. Co.*, 411 Pa. 409, 192 A.2d 745, 747 (1963); *see also Burr v. Commercial Travelers Mut. Acc. Ass'n*, 295 N.Y. 294, 301, 67 N.E.2d 248 (N.Y.1946) ("Philosophers and lexicographers have attempted definition with results which have been productive of immediate criticism. No doubt the average man would find himself at a loss if asked to formulate a written definition."); *Wickman*, 908 F.2d at 1087 ("Much of the inconsistency in the case law defining and applying the definition of accident is traceable to the difficulty in giving substance to a concept which is largely intuitive.").

Obviously, the sudden heart attack suffered by Richard Howard was neither expected nor foreseen by him. However, the problem with a definition of accidental death that relies exclusively on the foreseeability of the event is that any sudden death resulting from natural causes must then be considered an accident. Common sense, however, dictates that the common understanding of "accidental" is not so broad. Not surprisingly, the weight of authority in New York holds that death resulting from a heart attack suffered as a consequence of ordinary physical exertion is not accidental within the meaning of an accident policy. *See, e.g., Burr v. Commercial Travelers Mut. Accident Assn. of America*, 295 N.Y. 294, 305, 67 N.E.2d 248 (1946); *Wilcox v. Mutual Life Ins. Co.*, 265 N.Y. 665, 193 N.E. 436 (1934); *Zeide v. National Cas. Co.*, 187 A.D.2d 577, 578, 589 N.Y.S.2d 997, 998 (1992); *Valente v. Equitable Life Assur. Soc. of U.S.*, 120 A.D.2d 934, 935, 502 N.Y.S.2d 876, 877 (1986).

Federal courts applying ERISA common law have concluded similarly. In *Haley v. American Int'l Life Assurance Co. of New York*, 789 F.Supp. 260 (N.D.Ill.1992), the district court was faced with facts analogous to those presented here. In *Haley*, the court stated:

The word " 'accident' normally designates an unforeseen occurrence, usually of untoward or disastrous character, or an undesigned sudden or unexpected event of an inflictive or unfortunate character.... The natural and ordinary consequences of an act do not constitute an 'accident.' "
... As a general rule, in the absence of any unexpected or unforeseen trauma, external force or event which causes or triggers a heart attack, it is presumed that the death is a death by natural causes, not by an accident.

789 F.Supp. at 263 (citations omitted). Consequently, the *Haley* court concluded that a fatal heart attack, absent a triggering event, could not be considered an accidental injury. *Haley*, 789 F.Supp. at 263; *see also Shiffler v. Equitable Life Assur. Soc. of U.S.*, 838 F.2d 78, 84–85 (3d Cir.1988) (finding evidence

of coronary disease sufficient to grant summary judgment for defendant insurer).

This Court finds that the test articulated in *Haley* comports with the common understanding of the term "accident," as well as with New York common law concerning death by heart attack. Thus, in the absence of any unexpected or unforeseen trauma, external force or event which causes or triggers a heart attack, it is presumed that the death is a death by natural causes, not by an accident. Plainly, it is Plaintiff's burden to overcome this presumption.

■ Here, Plaintiff has not met her burden in showing that Richard Howard's death was due to accidental means. In fact, Plaintiff's doctors were unwilling to offer an opinion as to the *cause* of Mr. Howard's fatal arrhythmia. When Dr. Floyd was asked by Plaintiff's counsel if he could state with a reasonable degree of medical certainty what caused Richard Howard's "sudden cardiac death," he stated that he could not state the cause. When Dr. DiMenna was asked on direct examination whether he could state with a reasonable degree of medical certainty what caused Richard Howard's ventricular fibrillation, he stated that he could not state the cause. When Plaintiff's counsel asked Dr. Floyd if stress might be a contributing factor, he answered that it could be, but he went on to state that stress was likely "not a primary cause." Instead, both doctors listed a number of possible contributory factors, including Richard Howard's age, cholesterol, hypertension, and obesity.

Upon a review of all the evidence and testimony at trial, the Court concludes that Plaintiff has failed show that Richard Howard's death was caused by accidental means.

## III. CONCLUSION

For the foregoing reasons, the Court finds for DEFENDANTS on all of Plaintiff's claims.

**IT IS SO ORDERED.**