**John A. MOORE, Plaintiff,**

v.

**INA LIFE INSURANCE COMPANY OF NEW YORK, and Cigna Corporation, Defendants.**

**No. 97–CV–3560(JMA).**

United States District Court, E.D. New York.

June 2, 1999.

Aba Heiman, Scheine Fusco Bradenstein & Rada, Woodbury, NY, for plaintiff.

Kevin G. Horbatuik, Harvey Pennington Hasting & Renneisen, LLC, New York City, for defendants.

## MEMORANDUM AND ORDER

AZRACK, United States Magistrate Judge.

By stipulation dated September 17, 1998, the parties consented to have this case presided by me for all purposes, including entry of judgment, pursuant to 28 U.S.C. § 636(c). Originally, the matter before me was styled as a summary judgment motion, however, by consent and stipulation of the parties dated April 23, 1999, this matter was tried by me, based upon written submissions. *See Acuff–Rose Music, Inc. v. Jostens, Inc.*, 155 F.3d 140 (2d Cir.1998) (permitting the use of a bench trial on written submissions by consent of all parties) and *Meyer v. Insurance Co. of America*, No. 97 Civ. 4678, 1998 WL 709854 (S.D.N.Y. Oct.9, 1998) (conducting a trial on written submissions in an ERISA case). My decision in this trial was subject to a ruling on certain documentary evidence which plaintiff sought to exclude from the record. As detailed herein, I granted the request to exclude all the evidence which plaintiff objected to, and did not consider it when rendering my judgment.

In his complaint, plaintiff John A. Moore ("Moore") seeks to enforce his rights to recover benefits claimed under employee insurance plans administered by defendants ("CIGNA") and governed by the Employee Benefit Retirement Income and Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*. For the reasons set forth below, judgment should be granted to defendants regarding all claims asserted by plaintiff.

## BACKGROUND

I. *The Accident*

Moore was a Vice President at Morgan Guarantee Trust Company ("Morgan") and had been employed with the firm for over twenty-five years at the time of the accident which is the subject of this litigation. Pl.Mem at 6.[1] On the morning of Thurs-

---

1. References to Plaintiff's Memorandum of Law, shall be referred to as "Pl.Mem.", Plaintiff's Complaint and Amended Complaint shall be referred to as "Cmplt." and "Amd. Cmplt." respectively, while Plaintiff's Deposition shall be referred to as "Pl.Dep."

day, August 4, 1994, Moore flew from La-Guardia Airport in New York to National Airport in Washington, DC to attend a meeting with a Morgan client. Pl.Mem. at 7. On this trip, which was part of Moore's regular duties at Morgan, he was accompanied by Peter Chan, another Morgan employee. *Id.* When Chan and Moore arrived at Washington National Airport, they were met by Ethel Davis and Mary Faith Burke, Morgan employees who were also going to the meeting. All four employees shared a ride to the client's office, which was located on Louisiana Avenue in downtown Washington. *Id.*

The meeting began at 10:00 AM, and lasted until approximately 12:15 PM. After a lunch break, which lasted until 1:00 PM, Moore was advised that he was no longer needed at the meeting, since his topics of expertise had already been discussed. *Id.* Therefore, Moore was told that if he wanted, he could leave the meeting and return to New York early. *Id.*

At approximately 1:15 PM, Moore exited the building and hailed a taxicab. The cab, which Moore states was affiliated with the Globe Taxi Company, and assigned number 37, pulled up to the curb. Amd. Cmplt. at 6, Pl.Ex. C at 269, 272. Moore got in the front passenger seat of the cab, next to the driver. Pl.Mem. at 8. The cab then drove away, with Moore directing the driver as to his destination. *Id.* Before Moore could put on his seat belt, the front end of the cab struck the rear of another vehicle which was stopped at a red light. *Id.*

The impact caused Moore to be thrown forward from his seat, and the top of his head hit the taxi's windshield, leaving cracks. *Id.* Although the force of the impact between Moore and the windshield was significant, Moore's head never went through the windshield, but cracks in a "spider-web" like pattern were left in it. *Id.* Moore claims that he was dazed and confused, with immediate injuries that included a large bump on the head, smaller

bumps on his arm and knee, and a severe headache. *Id.*

Plaintiff exited the taxi, and sat down on a short stone wall near the scene, trying to collect himself from the dizziness, nausea and shock caused by the accident. *Id.* As Moore tried to collect his senses, he watched the cab driver and the driver of the other car argue, and then drive away. *Id.* Moore claims that he was unable to get any information from either driver, but he is certain that the cab in which he was a passenger was Globe Cab Company, car number 37. *Id.* At the time of the accident, Moore never reported the incident to the Washington, DC police.

After the accident, Moore eventually made his way to Washington National Airport, where he claims he called his wife and told her about the accident. *Id.* Moore then boarded a return flight and made it back to New York by dinner time. *Id.*

Moore went to work the next day, and claims that he told his manager, Kyle Tibbetts, and a secretary, Patricia McQuade about the accident. *Id.* at 9.

## II. *Moore's Injuries*

By August 9, 1994, five days after the accident in Washington, Moore started to get "sciatic-type" pain radiating from his lower back down to his legs. *Id.* At some point on or before August 10, Moore reported these pains to Kyle Tibbetts. *Id.* By the end of business day on August 9, Moore was in great pain and claims to have had difficulty walking. *Id.*

After August 9, 1994, Moore did not return to work, except for periodic and intermittent attempts between October 11, 1994 and November 28, 1994. Amd. Cmplt. at 7. Since November 28, 1994, Moore has not returned to work at Morgan. *Id.*

Moore contacted his regular physician, Dr. Flavio Crisari, MD, ("Crisari") on August 9, and told him about the accident, his pain and back problems. *Id.* Moore sched-

uled an appointment and examination with Crisari for August 15, 1994. Pl.Mem. at 9. After that examination, Crisari Wrote a note that Moore was suffering from muscle spasms, and could return for light duty work. Def.Ex. D at 43. Moore continued to consult Crisari for various ailments for almost two years after this visit, however, Crisari's notes indicate no further complaints by Moore concerning his back.

As a result of the August 1994 visit, Crisari sent Moore to Richmond Hill Radiology for x-rays and a CAT scan of the lumbar spine area. Pl.Mem at 9. The CAT scan revealed that Moore suffered from herniated disc at L2 and L3, bulging disks at L3–L5, and narrowing and arthritic changes at L5–S1. Pl.Ex. C at 143. A second, contemporaneous radiology report revealed degenerative disc disease with narrowing of disc spaces L2, L3 and L4. Id. at 144.

Moore also was referred to Dr. Sylvester Lango ("Lango") an in-house orthopedist affiliated with Morgan. Pl.Mem. at 9. Moore consulted with Lango repeatedly from October 1994 to December 1994. Pl. Ex. C at 137–139. In addition to the examination, Lango ordered an MRI scan, which was performed at Long Island MNR, which showed evidence of herniated discs at L4–L5 and L2–L3. Id. at 52. Lango's reports, dated December 9, 1994 and December 23, 1994, indicate that Moore continued to suffer from lower back pain. Id. at 138–139. The reports further indicated that Moore was depressed, worried and sleepless due to concerns over his back pain. Id. Both reports indicate that Lango recommended that Moore continue

physical therapy and nonsteroidal anti-inflammatory drugs[2]. Id. In his December 23, 1994 report, Lango stated that "patient need (sic) psychiatric help", apparently due to his depression. Id. at 138. In both reports, Lango indicated that Moore was totally disabled, however, in the field labeled "Rehabilitation" Lango also indicated that there were no factors delaying Moore's recovery. Id. at 138–139.

At approximately the same time that Moore was sent to Lango, Moore also decided to seek treatment from Corey Gold, a Manhattan based chiropractor. Id. at 37. Moore first visited Gold on September 26, 1994, complaining of (1) lower back pain, right hip and leg pain; (2) right neck, shoulder and arm pain; (3) left knee pain; and (4) insomnia and sleeping problems. Gold examined the x-rays and MRIs previously taken by Richmond Hill Radiology, and Long Island MNR. Id. Gold stated that Moore suffered from a permanent partial disability. Id. at 138. According to the Gold's report, dated November 6, 1995, Moore was treated at Gold's office with a regimen of spinal manipulation from September 26, 1994 through March 20, 1995, when Moore discontinued treatments with Gold[3]. Id.

Moore then began treatment with Dr. Anthony Cirillo ("Cirillo") an orthopedist, on March 14, 1995. Id. at 83. Cirillo's examination of Moore, and the MRI's, resulted in conclusions that were similar to those of Gold. Id. at 84. Cirillo referred Moore for physical therapy, and prescribed Flexeril. After repeated treatment and visits, Moore's condition was unchanged, leading to a depressed mood, and

---

2. Nonsteroidal anti-inflammatory drugs ("NSAID") are non-narcotic drugs that have analgesic, anti-pyretic and anti-inflammatory properties. Benjamin F. Miller and Claire Brackman Keane, *Encyclopedia and Dictionary of Medicine, Nursing and Allied Health* 1034, (Mary O'Toole et al. eds, W.B. Saunders Co.1992). This category of drugs includes ordinary over-the-counter products such as ibuprofen and aspirin. Id. Some common "prescription only" NSAIDs include phenylbutazone and indomethcin. Id. However,

Lango's records, as produced by plaintiff, do not indicate that Lango directed Moore to take a "prescription only" NSAID to relieve his lower back pain.

3. I cannot entirely credit Gold's opinion regarding Moore's continued pain and symptoms, since Gold's evaluation was written in November 1994, almost eight months after Moore's last visit.

a recommendation by Cirillo that Moore should seek psychiatric help. *Id.* Finally, Cirillo stated that Moore continued to suffer from injuries sustained in the accident, and opined that Moore was totally disabled at that time. *Id.* In a May 1996 letter, Cirillo stated that Moore's condition was still unchanged. *Id.* at 20.

Moore has also undergone a battery of medical examinations because of injury and disability claims he made with the Workers' Compensation Board, his automobile insurance company and the Social Security Administration. The record demonstrates varying interpretations of Moore's condition.

Dr. Daniel Feuer ("Feuer"), a neurologist, examined Moore in June 1995 as part of Moore's No–Fault insurance claim. Def.Ex. D at 4. Feuer found no "neurological disabilities which are casually related to the motor vehicle accident". *Id.* at 7. From a neurologist's standpoint, Feuer found that Moore could resume daily activities without restriction. *Id.* Dr. Michael Kreitzer ("Kreitzer"), another neurologist, also examined Moore in June 1995 and came to conclusions that were similar to Feuer's. *Id.* at 8–11.

Another radiologist, Sondra Pfeffer ("Pfeffer") reviewed the April 1995 MRIs for Moore's No–Fault carrier. *Id.* at 14. Pfeffer found that "no causal relationship exists between disc herniation and (the) trauma of 8–4–94, the herniation being related to the underlying degenerative condition rendered".

Moore's automobile insurance carrier also sent him to Dr. Jacob Toledano, ("Toledano"), an orthopedist, for an independent medical examination in June 1995. *Id.* at 18–20. Toledano reviewed Moore's medical records and MRIs, and conducted a physical examination of Moore. *Id.* Toledano noted that Moore's cane usage was erratic, and that Moore told him that he was capable of driving his own automobile. *Id.* After reviewing various MRIs, Toledano stated that he believed that Moore's condition represented pre-existing and longstanding degenerative changes. *Id.* The MRIs, along with Toledano's examination, led him to conclude that while there may be a relationship between the accident and Moore's condition, the accident was merely the aggravation of a pre-existing condition. *Id.* Toledano concluded that Moore was capable of returning to work, but he should avoid strenuous activities. *Id.*

Apparently at the request of Morgan, Moore also visited Dr. Thomas Errico, MD, (Errico), a professor of orthopedic and neurosurgery at New York University in May 1995. *Id.* at 24–25. Errico reported that Moore was in "a taxi which was rear-ended." Errico examined Moore and examined his MRIs, which Errico stated, "revealed multiple degenerative disc disease." *Id.* Errico believed that Moore was unable to perform sedentary tasks due to his back pain and inability to sit. However, Errico also believed that the accident exacerbated degenerative changes to Moore's back, although there was no reported history of back problems before the accident.

An examination and record review was conducted in June 1995 by Dr. Edward Toreillo, MD ("Toreillo"), an orthopedist, who indicated that Moore had no disability with regards to his surgical spine injury. *Id.* at 30. Toreillo further opined that Moore suffered from moderate partial disability to the lower back, and that an orthopedic follow-up was needed. *Id.* at 31. Toreillo concluded that Moore was not able to return to work at that time.

A chiropractor, Michael Perillo, ("Perillo") examined Moore in January 1995. *Id.* at 32. Perillo did not examine any x-rays or MRI scans when making his evaluation of Moore's condition, although he did review the original radiology reports made at the time of the August 1994 scan. *Id.* at 34. Perillo stated that based on the given history, the injury was due to the accident, however, he thought that Moore suffered from a mild degree of disability. *Id.* at 37.

Perillo further opined that Moore could attempt to return to sedentary work. *Id.*

An examination by Dr. Alice Murnane, MD, ("Murnane") an orthopedist, indicated that Moore could work, provided his standing, lifting and bending were restricted. *Id.* at 42. Murnane believed that Moore suffered from a mild disability. *Id.* At the time of Murnane's examination, she noted that Moore reported that his condition was significantly improving. *Id.* at 39.

In May 1995, Moore was examined by Dr. Sana Bloch, MD ("Bloch"), a neurologist who appears to have been retained by the plaintiff's counsel. *Id.* at 67. At the beginning of her report, Bloch makes the following statement, contradictory to any other medical reports in the record:

"Mr. Moore relates that he is a 50 year old male who had low back problems that resolved after two or three days at a time and some neck spasm that resolved after a short period of time." *Id.*

Bloch reviewed Moore's treatment history, and examined the MRIs taken in December 1994. Bloch concluded that Moore was permanently and totally disabled as of November 28, 1994. *Id.* at 70. Bloch advised against surgery, and suggested that Moore continue with physical therapy. *Id.*

## DISCUSSION

Pursuant to the agreement of the parties, I have considered the documents originally submitted on the summary judgment motion as a bench trial based upon written submissions. As such, I write not only as a finder of law, but also as a trier of fact. After a careful review of the parties' submissions, I find that the facts and law in this matter do not support a plaintiff's verdict, and thus, I find for defendants. As I will discuss herein, my decision is not based upon any one fact alone, but rather the weight of the entire record, as applied to the relevant law. Although I considered the whole record in arriving at this verdict, my written decision will focus on those issues and factors which had the greatest effect on the outcome.

## I. Relevant Evidence and Applicable Law

### A. Scope of Review

The parties in this action disagree with regard to the scope of my review, both in the original summary judgment motion and in the subsequent trial by consent. Plaintiff urges that I consider only the evidence available to defendants at the time that defendants decided to deny Moore disability benefits. However, CIGNA believes that I should consider the larger record, including certain materials developed in discovery. In the parties stipulation to the instant bench trial, they agreed that this trial would be subject to ruling upon plaintiff's motion to exclude certain material which was developed through discovery, but was not available to CIGNA at the time it made its decision to deny Moore disability benefits. The material that plaintiff objected to included Moore's deposition, along with certain summaries and expert reports prepared solely for litigation. Pl.Mem. at 2.

The parties agreed that this matter should be reviewed *de novo*, and hence I am reviewing the decision of CIGNA as if I were the original decision maker. Therefore, it is my job to review the entire file available to CIGNA at the time that they denied Moore disability coverage. The *de novo* standard of review implies that I stand in the shoes of the original decisionmaker, and therefore, I should review those records which that same decisionmaker utilized in its denial of coverage.

Therefore, it would defeat the purpose of the *de novo* review, and be inherently unfair to all litigants, to review materials outside the record at the time the decision was made. In the instant matter, CIGNA developed new information, solely for litigation purposes, after they denied benefits to Moore. To consider this information is contrary to applicable standard of review.

Therefore, I have granted plaintiff's request, by only considering information available to CIGNA during the claims process, prior to this litigation, in passing judgment on this matter.

### B. Determining Disability Based Solely on the Language of the Plan

■ Plaintiff was granted · disability awards by the New York State Workers' Compensation Board and the Social Security Administration for injuries sustained in this accident. Additionally, Moore received an award from his automobile insurance carrier under New York's No–Fault Insurance Law. Plaintiff urges that this Court employ the reasoning and standards used to determine disability by these agencies in making a disability decision in the instant matter. In essence, Moore wants this Court to adopt these decisions, rather than make a determination based upon the language in the applicable CIGNA policies. As a matter of law, and practical reasoning, I find that while the decision of outside agencies are helpful guidance in this Court's deliberations, ERISA law and the *de novo* standard of review require me to make a reasonable determination based upon my own interpretation of the relevant policy language.

■ In making an interpretation based upon the CIGNA plan language, this Court is guided by the considerations inherent in ERISA and subsequent case law. Under the *de novo* standard of review, this Court essentially "stands in the shoes" ·of the ERISA fiduciary/administrator, and thus my decisions should be made solely in consideration of the plan and its potential claimants. ERISA fiduciaries must "discharge [their] duties with respect to a plan *solely* in the interest of the participants and beneficiaries and ... for the *exclusive* purpose of ... providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1) (emphasis added). The Workers' Compensation Board and the No–Fault Law are creations of state law, while the Social Security Administration is an independent federal agency. All of these entities are guided by their own extensive sets of rules, which primarily are creatures of legislation and government regulation. Therefore, the guidelines of the outside entities may or may not be in accord with the dictates of this ERISA Plan, and the resulting fiduciary duties.[4]

■ ERISA, and the subsequent case law, provide administrators and fiduciaries with a separate set of considerations, namely that of a trustee administering a plan under trust principles. Indeed, in its *Firestone* decision, the Supreme Court explicitly recognized that ERISA plans should be administered with the principles of trust law in mind:

> "ERISA abounds with the language and terminology of trust law. ERISA's legislative history confirms that the Act's fiduciary responsibility provisions," 29 U.S.C. §§ 1101–1114 "codif[y] and mak[e] applicable to [ERISA] fiduciaries certain principles developed in the evolution of the law of trusts." Given this language and history, we have held that the courts are to develop a "federal common law of rights and obligations under ERISA regulated plans." ... *Firestone*

---

4. In addition to considering the decisions of outside agencies with regard to Moore's disability, plaintiff asks me to consider the language of other plans when evaluating the language in this plan. For the same reasons I will state herein, such outside language will be used for guidance and reference, and is not dispositive.

Plaintiff's use of supportive outside language is poor, and does not offer any guidance to me as a finder of fact and law. In one instance, Moore asks me to use the guidelines in a disability plan formed between a local bus drivers' union and the Metropolitan Transportation Authority ("MTA"). However, a disability plan between the MTA, a state agency, and its employees is exempt from ERISA under the "governmental plan" exception. *Rose v. Long Island Railroad Pension Plan*, 828 F.2d 910, (2nd Cir.1987). Thus, the standard of review and guidelines in that plan are not automatically applicable in the instant matter.

*Tire and Rubber Company v. Bruch,* 489 U.S. 101, 110, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (citations omitted).

Acting in a capacity similar to a trustee, I must construe the plan primarily based upon plan language, the applicable ERISA legislation and ERISA case law. This Court must then consider the ultimate determinations of outside agencies as guidance only, not as controlling decisions.

No other courts have extensively discussed this point, however, those that have examined similar situations have found that the determinations of outside agencies are not controlling, but instructive. *See Durr v. Metropolitan Life Insurance Co.,* 15 F.Supp. 2d 205, 213 n. 2 (D.Conn.1998) and *Halpin v. W.W. Grainger, Inc.,* 962 F.2d 685 n. 11 (7th Cir.1992). In reviewing an ERISA plan administrator's decision under the arbitrary and capricious standard, the Second Circuit found that the decision to deny long term pension disability benefits in light of a short term Workers' Compensation award was not unreasonable. *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 442–43 (2nd Cir.1995). In another case, this circuit has also held that the definition of "disability" contained in the New York Workers' Compensation statute is not binding upon the trustees of an ERISA plan. *Kunstenaar v. Connecticut General Life Ins. Co.,* 902 F.2d 181, 184 (2nd Cir.1990). Therefore, I must construe and interpret the CIGNA plan according to its language and the record before me, using the determinations of outside decisionmakers for guidance only.

### C. *The Policies*

Moore seeks disability benefits under two ERISA plans, which CIGNA calls a Business Accident Policy and a Personal Accident Policy, respectively. The relevant language in each policy is similar, and subject to comparable interpretations. The terms of the Business Accident Policy and Plan provide that:

Continuous total disability, which must result from such injuries and commence within 30 days after the date of the accident, means the Insured's complete inability during the first year thereof to perform every duty of his occupation. "Permanent total disability" means the Insured's complete inability, after one year of continuous total disability as defined above to engage in any substantially gainful occupation or employment for the rest of his life. Def.Ex. A.

This plan pays benefits if you … die or become disabled as a result of an accident you had while traveling on Morgan business. Pl.Ex. A at 1.

The insurance company will pay benefits once it receives a claim, along with any other necessary documentation. (for example, proof of loss or identification of beneficiary). Pl.Ex. A at 5.

The Personal Accident Policy and Plan offer similar language.

### D. *Proof of the Accident*

■ Defendant maintains that their decision to deny benefits under their plans was justified because Moore has not provided any objective proof that the accident of August 4, 1994 actually occurred. Moore maintains that no independent substantiation of the accident is necessary. Both litigants are misguided in their approach to this issue, as they focus on what information CIGNA does *not* have. As I will discuss, the fact that an accident actually occurred is clearly necessary for Moore to receive benefits from these plans. However, the inquiry should center on the information provided by Moore to CIGNA, and whether such information could be verified. The inquiry therefore relies on what was available, rather than what was not. Given the record available to CIGNA, I find that Moore has not provided sufficient proof of an accident or occurrence, such that he is entitled to recover under these plans.

The parties agree that Moore's condition must be the result of an accident that occurred while he was doing business for Morgan, or traveling on such business.

Essentially, the occurrence of such an event is a condition precedent to payment under the plan. *See* Black's Law Dictionary 293 (6th ed.1990) (stating, as an example of condition precedent, that under a disability insurance contract, an insured is required to submit proof of disability before insurer is required to pay.) Unless the accident occurred, CIGNA has no obligation to pay Moore, regardless of whether or not he is disabled. However, this policy gives little direction on how the claimant is to demonstrate to CIGNA that an accident actually occurred.

■ ERISA is also silent on this point, and therefore this Court is left to consult other areas of law for guidance. In an ERISA regulated insurance plan, interpretation is guided by the principles of federal substantive law. *Howard v. Nat'l Education Association of New York*, 984 F.Supp. 103, 107 (S.D.N.Y.1997). A federal common law concerning the rights and obligations of fiduciaries and beneficiaries should be developed for ERISA plans. *Firestone*, 489 U.S. at 110, 109 S.Ct. 948. "In ascertaining the applicable federal common law, a court may 'draw guidance from analogous state law.'" *Howard*, 984 F.Supp. at 107, *quoting*, *Brandon v. Travelers Insurance Co.*, 18 F.3d 1321, 1325 (5th Cir.1994). This plan, its structure and its language clearly draw upon the principles of insurance law, thus, I will look to insurance law in seeking an interpretation of the proof required to demonstrate the existence of the accident.

Upon reviewing the considerable body of insurance law, this Court has been unable to find a case with circumstances which closely parallel this one. However, in drawing upon the cases available, it is clear to me that Moore has proffered insufficient evidence of an accident. In his memorandum, plaintiff compares this case to the metaphysical problem of the tree in the forest. The old saw goes, "If the tree falls in the forest, but no one was there to hear it, did it really fall?" Plaintiff, in arguing that the accident occurred, would opine that the hypothetical tree did, in fact, fall, although no one heard it. However, by disregarding the claim investigation conducted by CIGNA, Moore ignores the fact that a falling tree cannot make a sound in the forest if that tree was never there in the first place.

Both sides dispute the significance of surrounding circumstances or lack of outside evidence of the taxicab collision. CIGNA argues there was no police response to the alleged accident, there was no ambulance report, and no pedestrian witnesses in an otherwise busy area of Washington, DC. Therefore, CIGNA urges, the accident never happened. Moore counters with the assertion that the surrounding circumstances are irrelevant, and that his account is enough to show there was an accident. The required proof, in my view, is somewhere in between.

■ Proof to support an insurance claim is not satisfied by the mere claim, but calls for evidence in some form that is sufficient to give notice to the insurer that the event on which liability hinges actually occurred. *Fox v. New York Life Ins. Co.*, 178 Misc. 673, 36 N.Y.S.2d 16, 18 (N.Y.Sup.Ct.1942), *citing* *O'Reilly v. Guardian Mutual Life Insurance Co.*, 60 N.Y. 169 (N.Y.1875). "'Proof', as in addition to notice, must mean evidence in some form, such form as is usual and customary in such cases, or as is recognized by law, and is calculated to convince or persuade the mind of the truth of the fact alleged. The bare statement of one of known character for truth, might convince one who knew him of the reality of the facts stated by him, but it would not be proof in any proper sense .... [proof] must be such reasonable evidence as the party can command at the time, to give assurance that the event has happened, upon which the liability of the insurer depends." *O'Reilly*, 60 N.Y. at 172. Due proof, which is an implicit requirement of these plans, requires reasonable proof of the conditions upon which the contract is based, although

an insurer cannot arbitrarily demand any particular type of proof. 70A New York Jurisprudence § 1868, (2d ed.1998). Due proof, affirmative proof and satisfactory proof all require that the insurer furnish some reasonable evidence to give assurance to the insured that the event upon which liability depends in question actually happened. 13A George J. Couch, et al., *Couch, Cyclopedia of Insurance Law,* §§ 49A:25–27 (2d ed.1983).

▪ The question of whether the accident occurred is a question for · the factfinder to determine, based upon the evidence available, and the legitimate inferences to be drawn from that evidence. 10 George J. Couch, et al., *Couch, Cyclopedia of Insurance,* § 41:44 (2d ed.1983) "The burden is on the plaintiff in an action on the policy to show that the alleged accident is the cause of injury." Rowland H. Long, *Richards on the Law of Insurance* 701 (1932) *citing, Nat'l Ass'n of Ry. Postal Clerks v. Scott,* 155 F. 92 (2nd Cir.1907). In an action upon a policy which insures against injuries arising from accidental means, the burden of proof is on the claimant to show that his injuries were caused solely by the accident, independent of all other causes. 19 George J. Couch, et al., *Couch, Cyclopedia of Insurance,* § 79:320 (2d.1983).

In the instant case, the only evidence that the plaintiff can offer of the accident is his own account of the alleged events. Simply restated, Moore claims that he was traveling in Globe Taxi Number 37 when it was involved in an accident on Louisiana Avenue in Washington, DC. Regardless· of the other surrounding facts, many of which are unclear to me, this is the one item of which Moore is *absolutely* certain. Moore provided the same description of the cab to J.P. Morgan, again in pressing his claim in the No–Fault insurance case, again to CIGNA, and even to this Court in his complaint.

However, it is an impossibility for Moore to have been in Globe Cab Number 37 on August 4, 1994. An investigator retained by CIGNA during the claims process went to Washington and interviewed the driver-owner of the cab. The investigator questioned Ernest Mickens, the owner of the cab, who, at the time of the interview, was a police officer at the U.S. Supreme Court. Mickens stated that he took the cab out of service in 1991, three years prior to the accident. The cab was later seized by the Prince Georges County Police Department, and apparently junked or salvaged. Mickens could not have been driving the cab on the date of the alleged accident because it was clearly not in service, and may not have even existed.

Therefore, Mickens, Moore's only identifiable "witness" to the ·accident, claims it never occurred. Moreover, the involvement of Globe Cab Number 37 in that accident is an impossibility. The cab that Moore claims to have traveled in was either not in existence, or in an impound lot at the time of the accident. Plaintiff does not challenge or address the investigator's findings in any way, and his silence on the issue is telling. Moore's only substantial evidence of an accident cannot be independently verified. Hence, this Court is merely left with Moore's word that the accident happened in the time, place, and manner in which he claims.

Reviewing this matter *de novo,* I cannot credit this account so that it results in an award to Moore. As I stated previously, the general principles of insurance law, along with the requirements of proof implicit in these plans, require me to find some reasonable, objective evidence that an accident occurred such that Moore should recover on his claim. Other than his own word, I have no such proof. While there may be some instances where an insurer would be compelled to pay where the claimant can offer no proof, this is not such a case. Here, we have a two car collision, where the claimant is the passenger. The claimant unequivocally identified the exact cab in which he was riding. However, it is uncontested that the cab and its driver-owner were not involved in

any accident on that day. The driver-owner of this cab was not even in the taxi business at the time of the event. There is no reasonable evidence to provide assurance that the events which would cause liability to incur for the insurer actually transpired. *See Fox*, 36 N.Y.S.2d at 18. In such a case, a reasonable insurer or plan administrator would not pay such a claim, therefore, I must deny plaintiff's claims in their entirety.

### E. *Is Plaintiff Disabled Under the Meaning of the Policies?*

Although my finding concerning the existence of the accident disposes of this case, I will also address the issue of plaintiff's disability as an alternative reason for denying Moore's claim. After an examination of the policies and Moore's medical records, I find that Moore is not disabled, and therefore is not entitled to recovery.

As I stated previously, in making the determination that Moore is disabled, I am guided mainly by the language in the CIGNA plans, using the interpretations of outside agencies for guidance, not as a dispositive gauge of his disability. However, while I have my doubts about whether Moore is "disabled" under the meaning of the plans, my larger concern is whether or not any disability that he may suffer was a consequence of events covered by the plans.

 Even if I were to view Moore's alleged disability in a light most favorable to him, that is, assuming that he is permanently and totally disabled as defined by the plan, the record leads me to believe that his disability is not due to a covered event. In order to receive benefits under the two accident policies, Moore must have been injured, and suffered the related disability, due to incidents that occurred while he was working for Morgan, or traveling on Morgan business. The record available to CIGNA indicated that Moore's disability appears to be the result of a degenerative back condition, and not due

to any sudden accident. I see no reason to change that decision.

Just after Moore claimed to have been involved in the taxi accident, he began to suffer back pain. Consequently, he sought medical treatment which included various radiological scans. The first scans taken on August 19, 1994, indicated degenerative disc disease and changes. This indicates to me that any disability that Moore may suffer was due to a pre-existing problem. Since I am not certain that this disability was caused by the alleged accident, I would deny benefits to Moore.

The record developed by CIGNA amply supports this proposition. Besides its own review, and examination by its own experts, CIGNA reviewed findings made by other doctors in the related claims. Dr. Pfeffer, a radiologist, reviewed MRI scans of Moore's back that were taken in April 1995. This review was conducted for State Farm Insurance, Moore's No–Fault Insurance carrier, *not* CIGNA. In her report, Pfeffer clearly concluded that there was no relationship between the accident and Moore's disc herniation, and that his injury was due to an underlying degenerative condition. Dr. Jacob Toledano, also retained by the State Farm, concluded that Moore's condition was due largely to a significant, longstanding, pre-existing degenerative changes and conditions.

In examining this record *de novo*, I have placed great weight in the radiological scans, and the later interpretations by Drs. Pfeffer and Toledano. These interpretations are significant, because they were not done at CIGNA's behest, but rather at the direction of State Farm, a third party without interest in this case. State Farm apparently shared CIGNA's belief that Moore was not disabled, and unsuccessfully arbitrated his claim. However, disposes of this case, I will also address the issue of plaintiff's disability as an alternative reason for denying Moore's claim. After an examination of the policies and Moore's medical records, I find that Moore is not

disabled, and therefore is not entitled to recovery.

As I stated previously, in making the determination that Moore is disabled, I am guided mainly by the language in the CIGNA plans, using the interpretations of outside agencies for guidance, not as a dispositive gauge of his disability. However, while I have my doubts about whether Moore is "disabled" under the meaning of the plans, my larger concern is whether or not any disability that he may suffer was a consequence of events covered by the plans.

Even if I were to view Moore's alleged disability in a light most favorable to him, that is, assuming that he is permanently and totally disabled as defined by the plan, the record leads me to believe that his disability is not due to a covered event. In order to receive benefits under the two accident policies, Moore must have been injured, and suffered the related disability, due to incidents that occurred while he was working for Morgan, or traveling on Morgan business. The record available to CIGNA indicated that Moore's disability appears to be the result of a degenerative back condition, and not due to any sudden accident. I see no reason to change that decision.

Just after Moore claimed to have been involved in the taxi accident, he began to suffer back pain. Consequently, he sought after my review of the entire record I feel that I must credit the opinions that Moore's current condition is due to pre-existing problems, and not due to any accident or incident that took place while plaintiff was working for Morgan.

In addition to the medical findings indicating that Moore suffered from a pre-existing condition, we have the words of Moore himself. In addition to the battery of tests performed at CIGNA's request, Moore was also examined by a doctor acting on behalf of his attorney. This doctor, Dr. Sana Bloch, examined Moore in May 1995, apparently in support of Moore's appeal process before CIGNA made a final decision on Moore's claim.

As part of the examination process, Bloch interviewed Moore to obtain a complete physical history. Moore informed Bloch that he suffered from episodes of lower back problems and neck spasms prior to the August 1994 accident, and that these episodes resolved themselves after two or three days. This is a complete turnabout, since in prior interviews, Moore never told the examining physicians about any pre-existing back or neck problems.

This statement, in combination with the scans and related interpretations, leads me to conclude that Moore was not entirely truthful with regard to his medical history, at least as it relates to his back pain. I must give credit to Moore's statement, made to a specialist retained by his own attorney, in support of his claim with CIGNA.

Finally, in deciding that Moore's back problems were pre-existing, I must look to other aspects of plaintiff's medical history and condition. Moore is a large man, overweight, a heavy smoker and suffers from ulcers to such an extent that he has problems using many analgesic medications. When looking at his medical records, the MRI scans, and his statement to Dr. Bloch in this context, I can reasonably conclude that Moore's back pain is not due to a particular incident, but rather due to pre-existing factors. Therefore, Moore is not entitled to benefits under the two CIGNA plans.

### CONCLUSION

For the reasons stated above, I find for defendants on all claims by plaintiff, John Moore. Therefore, judgment should be entered for defendants INA Life Insurance Company of New York and CIGNA Corporation.

SO ORDERED.